☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>The Cellular Telephone Assigned<br>Call Number (213) 444-9828 | )<br>)<br>)  Case No.  22-824M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   2/24/22   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Hon. Nancy Joseph   .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of   09/08/2022   .

Date and time issued:    2/10/22 @ 1:05p.m.                          *Judge's signature*

City and state:   Milwaukee, Wisconsin                    Hon. Nancy Joseph, U.S. Magistrate Judge
                                                          *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

*Executing officer's signature*

*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1.	Records and information associated with the cellular device assigned call number (213) 444-9828 (referred to herein and in Attachment B as "Target Cell Phone #1"), with listed subscriber unknown, that is in the custody or control of Verizon Wireless, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

2.	Target Cell Phone #1.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with Target Cell Phone #1 for the time period November 1, 2021, to the present:

i.      Names (including subscriber names, user names, and screen names);

ii.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.      Local and long distance telephone connection records;

iv.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.      Length of service (including start date) and types of service utilized;

vi.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.      Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Cell Phone #1 for the time period November 1, 2021, to the present including:

   a.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b.   information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b.   Information associated with each communication to and from Target Cell Phone #1 for a period of **30** days from the date of this warrant, including:

   i.   Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii.   Source and destination telephone numbers;

   iii.   Date, time, and duration of communication; and

   iv.   All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which Target Cell Phone #1 will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

c.   Information about the location of Target Cell Phone #1 for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

   i.   To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone #1 on the Provider's network or with such other reference points as

may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.	This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

**II.	Information to be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 involving Phillip Daniels.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)*   )          Case No.    22-824M(NJ)
                                                )
The Cellular Telephone Assigned          )
Call Number (213) 444-9828               )
                                                )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution of and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 09/08/2022 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO Joseph Scheuring
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:  2/10/22

_____
*Judge's signature*

City and state:  Milwaukee, Wisconsin

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

I, Joseph Scheuring, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.        I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(213) 444-9828** ("**Target Cell Phone #1**"), whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey. **Target Cell Phone #1** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.        Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.        I am a federally deputized Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I am currently assigned to the High Intensity Drug Trafficking Area (HIDTA) and have been since August 2020. I am also currently a Milwaukee Police Officer and have been since October of 2007.  Over that collective period, I have participated in many complex narcotics investigations.  I have also had training regarding the investigation of narcotics crimes.  Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug

2

traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds.   I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4.      I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

5.      As part of my duties as a DEA TFO, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, and federal firearms offenses, including violations of Title 18, United States Code, Sections 922(g), 924(a), and 924(c).  In the course of my experience, I have and continue to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang investigations, organized crime, violent crime, firearms offenses, drug trafficking, thefts, counterfeit crimes, including cellular telephones and other electronic telecommunication devices.

6.      Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

a.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business and that electronic telecommunications are used to conduct drug trafficking;

b.      I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records,

3

passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations, including storage locations, over which they maintain dominion and control;

c. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

d. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, storage facilities, or personal residence;

e. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and

4

communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

f.     Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.     Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

9.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession

5

with the intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Phillip DANIELS SR. (DOB XX/XX/1976). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**<u>PROBABLE CAUSE</u>**

11.     In January 2022, law enforcement officers in Milwaukee, Wisconsin, initiated an investigation into individuals distributing large quantities of methamphetamine and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) to be Phillip DANIELS SR. (DOB XX/XX/1976). The investigation has revealed that DANIELS obtains controlled substances from a source of supply in California, and the controlled substances are sent to Milwaukee, Wisconsin, using the United Postal Service (UPS) and/or FedEx, or couriers drive the controlled substances from California to the midwest United States at the direction and control of DANIELS. The investigation has further revealed that numerous criminal associates assist DANIELS to facilitate the DTO.

*January 5, 2022, Seizure of Methamphetamine and Marijuana*

12.     On or about January 5, 2022, the United States Marshal Service (USMS) Fugitive Taskforce members were involved in an investigation of K. D.  K.D. was wanted by

6

the Waukesha County (Wisconsin) Sherriff's Office for cocaine distribution. The arrest warrant was issued on or about July 15, 2021, under Waukesha County Wisconsin Circuit Court Case Number 21CF1089.

13. On or about January 5, 2022, USMS Fugitive Taskforce members arrived at the 87xx N. Deerwood Drive in Brown Deer, Wisconsin, which is the address of record and known address of K.D. Taskforce members knocked on the front door of the apartment, which was answered by Joelle MASSEY. (DOB: XX/XX/1996). MASSEY told Taskforce members that she knew K.D., and that MASSEY was home alone with her baby who was sleeping in bed upstairs.

14. Taskforce members explained to MASSEY that this was the known address of K.D. and that they had a warrant for K.D.'s arrest and wanted to check for K.D.'s presence. Upon entering the apartment, Taskforce members observed a strong odor of fresh marijuana.

15. While in the apartment searching for K.D., Taskforce members observed on the bed, next to the baby, in plain view, a large quantity of U.S. currency. On the closet floor, near the opening, also in plain view, was an open box containing a large quantity of green plant material, which, based upon the Taskforce members' training and experience, appeared consistent with marijuana. The marijuana appeared to be in vacuum sealed packaging material. Taskforce members also observed in plain view a red plastic bag next to the open box that also contained a quantity of suspected marijuana. On the stand next to the bed, Taskforce members additionally observed in plain view a stun gun and medications in the name of MASSEY. Taskforce members cleared the residence and did not locate any occupants other than MASSEY and the sleeping baby.

16. Based upon the evidence observed in plain view, agents at the scene secured the residence applied for a federal search warrant for the residence. MASSEY was not under arrest

7

at that time.  The federal search warrant was presented to the Honorable William E. Callahan, Jr., United States Magistrate Judge in the Eastern District of Wisconsin on January 5, 2022. The warrant, under case 22-M-305 (WEC), was granted on January 5, 2022, at approximately 11:50 a.m.

17.     After the residence had been cleared and agents were awaiting the search warrant, MASSEY received a phone call from DANIELS. MASEEY identified the caller as the father of her child and her husband. MASSEY was allowed to take the call, and the conversation was conducted on speaker phone in the presence of an agent. DANIELS asked MASSEY how case agents gained access to the residence, and she responded that she let case agents into the residence.

18.     On January 5, 2022, agents presented the warrant issued in 22-M-305 (WEC) to MASSEY in digital form and read the warrant and the attachments aloud to MASSEY and she related that she understood. Immediately after agents presented MASSEY with the warrant, she stated that she needed to call her "husband," and agents permitted her to do so. MASSEY was at first unable to reach her "husband," and she placed another call to the individual to whom she stated she was trying to reach "Phil." MASSEY then received a call from DANIELS, and she informed him that officers got a search warrant. During the call, MASSEY can be heard saying "it was out," "they don't have anything," and "it was just on the bed."  Later in their conversation, MASSEY tells DANIELS that the agents are not going to take the money, but she then asks agents whether the money will be taken. Agents respond that the money will be taken. MASSEY and DANIELS continue to discuss the circumstances.  After MASSEY's call ended, case agents conducted a *Mirandized* interview of MASSEY, at which time she stated she did not wish to speak regarding the whereabouts of K.D. or about the narcotics and U.S. currency observed in the residence.

8

19.     During the execution of the federal search warrant at the residence, agents observed and/or recovered numerous items of contraband.  During the search of the upper eastside bedroom, which MASSEY identified to agents as her own bedroom, and which contained her clothing and sleeping baby, agents observed an open box containing suspected marijuana.  From within that box, agents recovered 7 individual vacuum sealed bags containing a total of approximately 1,587.57 grams of green plant material, which tested positive for the presence of marijuana.  Agents also recovered from a red plastic shopping bag next to the box 3 individual vacuum sealed bags containing a total of approximately 1,179.34 grams of green plant material, which tested positive for marijuana.  From the top of the bed in that room, agents recovered a quantity of U.S. currency divided into stacks, and a plastic shopping bag containing additional U.S. currency.  Case agents observed two medication bottles, belonging to MASSEY, on top on the nightstand next to the bed.

20.     Agents found a total of approximately $45,448 in U.S. currency that was located in the residence.

21.     During their search of the main floor kitchen/dining area of the residence, agents observed and recovered several white plastic screw-on top containers.  The agents found that one of the containers contained 4 individual plastic bags.  Each plastic bag contained a crystal-like substance, which tested positive for the presence of methamphetamine.  In total, the four bags contained a total of approximately 1,885 grams of a crystal-like substance, which tested positive for the presence of methamphetamine.  The agents also found a shipping box, with a circular imprint similar to the top of one of the white plastic containers, located next to the white plastic containers.  The shipping label was addressed to MASSEY with the address for the residence at 87xx N. Deerwood Drive, Brown Deer, Wisconsin, and the label indicated it was shipped by M.H., from an address in Los Angeles, California.  Agents are aware, based upon

9

training and experience, that California is a known source state for crystal methamphetamine that is smuggled across the border from Mexico to California and then shipped to various locations throughout the United States for further distribution.

22.     Additionally, agents recovered approximately 34 individual gem pack bags, each of which contained a crystal-like substance, which tested positive for the presence of methamphetamine, from an Adidas bag on the kitchen counter.  In total, the bags contained approximately 15 grams of a crystal-like substance, which tested positive for the presence of methamphetamine.  An additional 30 gem pack bags, containing the crystal-like substance, were recovered by agents from a Louis Vuitton bag on the kitchen counter.  In total, those 30 gem pack bags contained an additional approximately 10 grams of a crystal-like substance, which tested positive for methamphetamine.  A plastic firearm box for a Glock, model 27, pistol was also recovered by agents from a kitchen cabinet, however, a firearm was not recovered. Agents also recovered three digital scales as well as additional, empty gem pack bags from a kitchen drawer.

23.     Throughout the residence, agents also recovered personal identifying information for DANIELS, including DANIELS' social security card and his driver's license, which lists his address as 12605 W. North Avenue 146, Brookfield, Wisconsin. The address listed with Wisconsin Department of Motor Vehicle for both DANIELS and MASSEY is 12605 W. North Avenue 146, Brookfield, Wisconsin. A check of this address revealed that the address is a UPS store with numbered boxes for mail. Based on my training and experience, it is common to use P.O. boxes or different mailing address when sending narcotics through the mail in attempts to avoid law enforcement detection.

10

24.     Additionally, case agents observed numerous photographs of DANIELS and MASSEY in the residence, and in the bedroom identified as MASSEY's, agents also observed male clothes.

25.     Agents also recovered evidence of a bank account and safety deposit box with Wells Fargo in the name of DANIELS. Specifically, agents recovered a Safe Deposit Lease Agreement dated on or about December 10, 2021. According to the lease agreement, DANIELS held Wells Fargo account #5630108255, and he was the "sole lessee" of Safety Deposit Box #R1095 in St. Paul, MN. A warrant was obtained for this safety deposit box, and the warrant was executed on February 4, 2022.  However, agents learned at that time that the safety deposit box had been emptied on January 5, 2022.

26.     Also located in the residence were copies of two cashier's checks dated December 2021, which were drawn from DANIELS' Wells Fargo account #5630108255 and made payable to J.C., who agents believed to be an individual located in California. The amounts of the cashier's checks were $7,850 and $15,300.  Agents further recovered a deposit receipt dated December 15, 2021, reflecting a $9,010 deposit into Wells Fargo account ending in x8255. Approximately $3,900 of the total deposit consisted of $20.00 bills, which agents believe to be indicative of drug trafficking based upon their training and experience.

27.     From the residence, case agents also recovered airline tickets for DANIELS and MASSEY from Chicago, Illinois, to Los Angeles, California, as well as an airline ticket for MASSEY from Milwaukee, Wisconsin, to Chicago, Illinois.

28.     Within the residence, case agents also recovered a receipt for a $5,500 MoneyGram transfer dated June 2021, wherein MASSEY sent U.S. currency from Minneapolis, Minnesota, to a liquor store in Los Angeles, California.

11

29.     Agents also recovered hand-written drug ledgers wherein quantities of controlled substances, prices, and amounts paid were memorialized.  Based on their training and experience, case agents believe that the controlled substances referred to include methamphetamine, cocaine, and different strains of marijuana.

30.     Agents also recovered rental agreements for various storage units held by DANIELS.  Specifically, agents recovered rental agreements indicating that the rent would increase on each of the units beginning in January 2022 for two storage units held by DANIELS at East Bank Storage, in Milwaukee, Wisconsin.  Agents later discovered that DANIELS rented a third storage unit at East Bank Storage.  Agents obtained federal search warrants for these three storage units, which were executed on January 7, 2022. At this time, agents recovered numerous financial documents and evidence of businesses held by MASSEY and DANIELS.

31.     On January 5, 2022, during a *Mirandized* interview of MASSEY at the police station, MASSEY referred to DANIELS as her "husband."

32.     On January 6, 2022, agents received a voicemail from DANIELS inquiring about the status of his "wife," MASSEY.

33.     Case agents know from their observations and from evidence acquired in the investigation that MASSEY and DANIELS have a child in common and believe that they are in a long-term dating relationship.

34.     Pursuant to the search warrant, agents downloaded various devices seized from the residence. From an iPad that agents recovered from the residence, the download revealed numerous pictures of DANIELS holding large quantities of U.S. currency, which was banded with the same band and in the same manner as the quantities of U.S. currency recovered from MASSEY's bedroom on January 5, 2022.  Additionally, on the download of the iPad recovered

12

from the residence were numerous pictures of large quantities of marijuana and pictures of firearms.  DANIELS is a convicted felon and prohibited from possessing firearms.

35.     A forensic extraction of MASSEY's phone was also performed pursuant to the search warrant. This extraction revealed the following:

a.     On September 7, 2020, MASSEY and DANIELS appeared to have an argument about an unknown individual shortchanging them while cooking crack cocaine under MASSEY's supervision.  DANIELS attributed the issue to MASSEY's lack of vigilance.  He wrote, "Yo ass was sitting at the table while he was at the stove right or wrong.  Why are you sitting at the table he was over there scamming the pot."  MASSEY responded that DANIELS had not yet taught her what she ought to be doing in such a scenario.  DANIELS replied, "You were supposed to come out 56 g I told you that ever else is 28 g and 2856 you over that smelled like you did something spectacular win shit ain't even win out right that's why I said you have to grow up and learn the shit I got to do it every day and you don't know shit."

b.     On September 12, 2020 at approximately 2:21 a.m., DANIELS messaged MASSEY saying, "Got someone who wants 2 dubs of girl.  I am on the eastside by locust and Oakland can one of you guys come by?"  In my training and experience, I know that the term "girl" is coded language for cocaine. Therefore, I believe that DANIELS told MASSEY that he had a customer lined up to buy an amount of cocaine.

c.     On October 4, 2020, MASSEY messaged DANIELS, "They like my loud out here, I gotta find some more quality big daddy."  DANIELS replied, "Found it" followed by "Getting it today."  MASSEY told him their neighbor took $40 worth the day before and wanted another $40 worth that day.  DANIELS answered that he told MASSEY it would go this way, and that he was going to begin investing her money in loud to let her build her way up.  They

13

discussed how she could do well if she had a quality product for which they could charge a good price. In my training and experience, I know loud to refer to strong or high-grade marijuana.

d. On October 23, 2020, MASSEY and DANIELS discussed an unknown individual referred to as "Damo" by DANIELS and "Domo" by MASSEY. MASSEY informed DANIELS that Domo had been trying to call DANIELS to say he was bringing over some money. DANIELS instructed MASSEY to tell Damo that all she had left was "hard," which I know in my training and experience to refer to crack cocaine, adding, "If he want it ok but if not just collect the paper 1675 X2= 3350.00." Later that day, DANIELS indicated he was unavailable because he was trying to close a deal.

e. At various times, DANIELS sent MASSEY names and address for the apparent purpose of having her ship drugs there. For instance, on October 25, 2020, during a layover in Charlotte, North Carolina (according to messages) DANIELS texted MASSEY, "234 Bates ave Saint Paul mn 55106. Send those last two hard to this address last name (Latrice SIMMS)." MASSEY indicated that there were no post offices open that day, but she would send the package the following day before flying out to meet him. The following day at 4 p.m., MASSEY texted DANIELS a photo of a receipt showing that she had mailed a padded envelope with next-day delivery guarantee to Saint Paul, Minnesota that day at 2:50 p.m.

f. On January 27, 2021, MASSEY and DANIELS again discussed Damo/Domo. MASSEY asked DANIELS, "Did Domo pay for the 6 last time or you just gave it to him ?" When DANIELS did not reply, she repeated her question, adding, "And is it only 1500 for those?" A few minutes later, she texted, "I'm trying to get business done and you're ignoring me."

14

g. Damo/Domo came up again in their texts on February 28, 2021. MASSEY reached out to DANIELS, saying, "I need to know what Domo is receiving." When DANIELS eventually responded they exchanged the following messages:

DANIELS: Make sure count collect before

MASSEY: GAVE; $16,900

$15,400 + $1,500(out of $5,490)

DANIELS: That not good

DANIELS: What about the jewelry

DANIELS: So he owe 3990 plus 2000

MASSEY: Yes

DANIELS: I told you to tell him he need to wrap it up and clear his tab out

DANIELS: We can't give nothing else until we wrap that bill up

DANIELS: You need your money

DANIELS: He should of at least gave you 20k

DANIELS: So tell him we need to wrap that up ASAP

h. On March 18, 2021, MASSEY texted DANIELS, "I need Lou's number please." DANIELS replied, "I have a new connect for what you want I will have it together this weekend you will be able to order the best for an inexpensive price." He added, "Lou don't have the best." He then listed what I believe in my training and experience to be several strains of marijuana that the new connection had available, including "runts" and "gelato." MASSEY asked how soon she could go and see what they had. DANIELS answered that they are in the Bay Area and that he would put it together because his new connection there gets everything cheap. MASSEY indicated she was ready to fly out immediately, and DANIELS promised to

15

connect MASSEY directly to the plug so they could discuss what was on offer and for how much.

        i.      On December 25, 2021, DANIELS was away while MASSEY remained in Wisconsin. DANIELS texted Massey that she should get ready to learn how to cook for her first time. Based on my training and experience, I believe his subsequent messages walk her through how to cook crack cocaine. He wrote, "So weigh out 28 [grams] and get it ready," and "You are smart I trust you can handle it." She replied that she needed to get their infant daughter situated first so she could focus. DANIELS assured her that he would be on the phone. Then, he told her, "Get a pot And tha glass I use And Soda out." Next, he instructed her to start boiling a pot of water. Meanwhile, they discussed other people who were going to come by. DANIELS told Massey someone named Lodi was at the door and told her "2000." They also discussed another unnamed individual who was going to come by to see what was available once he got his money. During this conversation, DANIELS shared his Zelle money transfer account information, which included the name on the account, "Phillip Daniels."

        j.      On April 28, 2021, DANIELS indicates that Leroy wants the code to the safe and tells MASSEY to get it for him as others have items in the safe that need to say secured.

        k.      Messages between MASSEY and others further reflect her and DANIEL's potential involvement in the business of home health care.

### Confidential Source 1

36.    In early 2021, DEA and the Bureau of Criminal Apprehension in Minneapolis/St. Paul, Minnesota, were conducting a drug trafficking investigation in which approximately five pounds of methamphetamine, paraphernalia consistent with kilogram level distribution, and U.S. currency were seized from an individual later identified as CS 1.

16

37. On or about November 23, 2021, law enforcement conducted an interview of CS 1. CS 1 stated that CS 1 has known "Dr. Phil" (DANIELS) since approximately September 2020. CS 2 identified DANIELS by photograph. CS 1 stated that CS 1 sold multiple kilograms of cocaine, heroin, and methamphetamine for DANIELS from approximately September 2020-January 2021. CS 1 indicated that DANIELS would travel via a commercial airline multiple times a month to see if people were ready for more controlled substances. i.e., resupply and/or collect money from his various runners who assisted in his drug trafficking. CS 1 stated that DANIELS takes theses flights with U.S. currency inside of his luggage. CS 1 stated that DANIELS has also set up numinous LLCs in which he uses to get loans to move money. CS 1 indicated that DANIELS would have CS 1 sell the narcotics and would pick up the money at a later date. CS 1 indicated that if DANIELS did not pick up the money, CS 1 was tasked with depositing the money into a bank account under one of the LLCs. CS 1 indicated that this started around September of 2020. CS 1 provided a phone number for DANIELS in which the CS 1 would call when more product was needed or if the money was ready for pick up. Officers were able to verify the phone number CS 1 provided was an old number used by DANIELS. CS 1 indicated the DTO, which is run by DANIELS, also has other main subjects that CS 1 identified via picture as Roy HENTON, a/k/a "Pops" Roy HENTON's son, Leroy HENTON, and Jameel BRADLEY. CS 1 also identified additional subjects regarding the DTO.

38. Beginning in November 2021, CS 1 made statements against CS 1's penal interest. CS 1 has an armed robbery conviction, two firearm convictions, and one pending federal narcotics case. CS 1 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by

17

seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

***Confidential Source 2***

39.     On or about January 16, 2022, a traffic stop was conducted on a black Nissan Altima (WA BYG7898) that was being driven by an individual on I-15 near mile marker 71 in Summer, Utah. The individual was later identified as a confidential source, CS 2.  During the traffic stop, a Utah State Trooper observed a can of Lysol air freshener on the front passenger seat of a rental car.  Based upon the trooper's training and experience, he suspected the vehicle to contain narcotics.  A dog sniff was conducted on the Nissan Altima, and the dog alerted to the presence of the scent of narcotics coming from the trunk of the car.  The trooper subsequently conducted a search of the Nissan Altima ultimately locating a white plastic container with a screw off lid. This is the same type of packaging that held the Methamphetamine located in DANIEL's and MASSEY's residence. The trooper opened the container and located seven brick shaped objects he suspected to be cocaine.  CS 2 was placed under arrest and the suspected cocaine was taken for field testing.  The testing of the suspected cocaine tested positive for the presence of cocaine, and the approximate weight of the cocaine was seven kilograms.

40.     Case agents did conduct follow up, revealing the black Nissan Altima (WA BYG7898) was rented by Jameel BRADLEY (B/M XX/XX/1985).

41.     CS 2 stated that the car was rented by Jameel BRADLEY, and that she did not know any controlled substance were inside the vehicle. CS 2 stated she was just driving the black Nissan to Chicago then to Milwaukee to meet with friends.  She indicated that she has a friend named Joelle MASSEY who she would be staying with once in Milwaukee.

18

42. CS 2's phone was searched pursuant to CS 2's consent. Located in CS 2's phone extraction was a text message dated January 12, 2022, from **(213) 444-9828**, or **Target Cell Phone 1**, which stated "Janelle this Dr. Phil Please give me a call." See message below:



43. Based upon case agents' training and experience, and familiarity with this investigation, agents believe that DANIELS sent the message to CS 2 to inform CS 2 of his new phone number. Furthermore, case agents believe, based upon their training and experience, that it is common for drug traffickers to obtain new cellular telephone numbers to avoid detection by law enforcement officers. In this case, case agents believe that DANIELS changed his phone number to **Target Cell Phone #1** after controlled substances, drug trafficking paraphernalia, and a large amount of U.S. currency was seized from his residence on January 5, 2022.

44. CS 2 later provided information regarding DANIELS and the DTO. CS 2 stated that in July of 2020, DANIELS, a/k/a "Dr. Phil," and others have flown to California where CS 2 would meet them. CS 2 would drive them around and pick items up for them. CS 2 observed DANIELS and two other individuals, one being BRADLEY, open their luggage and remove multiple freezer sealed bags with U.S. currency. CS 2 observed one of the subjects leave and come back with a money counter. CS 2 did not know how much money was counted. CS 2 indicated that after the money was counted, CS 2 drove DANIELS and the others to a different

19

location and dropped them off. CS 2 did later pick up DANIELS and the others that same day after a short period of time. CS 2 indicated that DANIELS travels with others. CS 2 identified others in the group but indicated that DANIELS was the leader of the DTO.

45.     Beginning in January 2022, CS 2 made statements against CS 2's penal interest. According to law enforcement databases, CS 2 has no criminal record. CS 2 has one pending federal narcotics case. CS 2 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS 2 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 2's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

### *DTO Packages*

46.     Case agents are aware of a package being shipped through UPS with a tracking number of 1ZY829R30302077851 to 5234 N. Teutonia Avenue in Milwaukee.  The sender of the package was DXG Technology, M.H., the same individual who sent packages containing controlled substances located in DANIEL's and MASSEY's residence on January 5, 2022.  The receiver of the package was Christopher DANIELS, who is believed to be a family member of DANIELS.  On January 26, 2022, case agents conducted surveillance of the UPS delivery truck's attempt to deliver the package. However, there was no answer at the door and the package ultimately was delivered to a UPS drop location at CVS located at 3030 W. Villard Avenue.

### *Flight and Vehicle Information*

20

47.     On February 7, 2022, case agents conducted surveillance of a black 2016 GMC Yukon bearing Wisconsin plate M0NEY23 (Subject Vehicle 1), which vehicle listed to Christopher Daniels. During surveillance, officers observed the vehicle's driver was DANIELS and the front seat passenger was Roy Henton, a/k/a "Pops." The vehicle was surveilled from 9998 W. Fond Du Lac Avenue to General Mitchell International Airport (GMIA). Once at GMIA, DANIELS exited the driver's seat and walked inside to the American Airlines desk. Once at the American Airlines desk, he had a conversation with agent. Officers thereafter learned that DANIELS would not be able to check-in his bags and missed his flight. DANIELS, Leroy HENTON, and Roy HENTON were thereafter scheduled to depart GMIA on February 9, 2022, with a final destination of San Diego, California.

48.     On February 9, 2022, law enforcement conducted surveillance in the area of 99xx W. Fond du Lac Avenue, Milwaukee, Wisconsin. At approximately 12:06 p.m., officers observed Subject Vehicle 1 stopped at a red traffic signal, south bound on N. 107th Street, at the intersection of W. Good Hope Road, Milwaukee, Wisconsin. Law enforcement positively identified Phillip DANIELS as the driver of Subject Vehicle 1. Officers further identified Roy HENTON as the front seat passenger. Officers observed also observed a silhouette of a person, seated in the rear passenger seat, however, no description of that person could be obtained. Subject Vehicle 1 subsequently drove from the area, and law enforcement was unable to maintain surveillance on Subject Vehicle 1 during that time.

49.     Later that same day, officers reinitiated surveillance at 99xx/100xx West Fond Du Lac Avenue, Milwaukee, Wisconsin. At approximately 12:16 p.m., officers observed Subject Vehicle 1 drive up to and park in front of the apartment/residence located at 100xx West Fond Du Lac Avenue, Milwaukee, Wisconsin. During that time, DANIELS exited Subject Vehicle 1 and entered the residence. A short time later, DANIELS exited the residence, re-

21

entered Subject Vehicle 1, and drove from the area. Officers maintained surveillance on DANIELS and Subject Vehicle 1, and at 12:37 p.m., officers observed Subject Vehicle 1 enter the parking lot of the BMO Harris Bank located at 83xx W. Silver Spring Drive, Milwaukee, Wisconsin. DANIELS and Roy HENTON exited the vehicle and entered the bank. At 12:45 p.m., DANIELS and Roy Henton exited the bank and re-entered Subject Vehicle 1. Surveillance was maintained, and at 1:15 p.m., Subject Vehicle 1 was observed entering the ticketing/check-in drop off line at GMIA. Subject Vehicle 1 parked just beyond the door to the American Airlines entrance. DANIELS (Driver), Roy HENTON (Front Passenger), and Leroy HENTON (Rear Passenger) exited Subject Vehicle 1, obtained numerous luggage bags from the rear of the vehicle, and subsequently entered the airport ticketing area. Case agents observed the three individuals check their bag(s) with American Airlines and check in for their flight. At 1:25 p.m., all three individuals exited the airport and re-entered Subject Vehicle 1. DANIELS remained the driver. Subject Vehicle 1 was then surveilled into the public parking garage/structure of the airport and was observed parking in the labeled parking space "Yellow level 2H." DANIELS, Roy HENTON, and Leroy HENTON exited the vehicle and entered an elevator to go towards the sky walk of the airport. Case agents subsequently observed DANIELS, Roy HENTON, and Leroy HENTON go through TSA/security, towards the gate area.

50.     On Wednesday, February 9, 2022, Milwaukee Police Officer/HIDTA Officer Christopher Conway, a trained and certified handler of a controlled substance detecting K9 (Flexy), responded to the public parking garage where Subject Vehicle 1 was located.  At approximately 2:19 p.m., Officer Conway deployed Flexy around Subject Vehicle 1. Flexy alerted to the odor of a controlled substance on the driver side of the vehicle.

<b><u>CONCLUSION</u></b>

51. Case agents searched law enforcement databases to confirm that **Target Cell Phone #1** is currently being serviced by Verizon Wireless.

52. Case agents are requesting this warrant authorizing the disclosure of data related to **Target Cell Phone #1** for **30** days to further investigate DANIELS' activities, and to identify locations to which DANIELS is traveling to further his drug distribution network.

53. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that DANIELS is engaged in the trafficking and distribution of crystal methamphetamine and is using **Target Cell Phone #1** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of **Target Cell Phone #1** will assist case agents in determining DANIELS' customers, co-conspirators, sources of supply, and help to identify stash houses.

54. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural

23

Case 2:22-mj-00824-NJ    Filed 02/10/22    Page 29 of 39    Document 1

areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

55. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

56. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## E-911 Phase II / GPS Location Data

57. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information

24

about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

### Subscriber Information

58.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the

25

Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

**AUTHORIZATION REQUEST**

59.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

60.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

61.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

62.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As

26

further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

63.    Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

1.       Records and information associated with the cellular device assigned call number (213) 444-9828 (referred to herein and in Attachment B as "Target Cell Phone #1"), with listed subscriber unknown, that is in the custody or control of Verizon Wireless, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

2.       Target Cell Phone #1.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.     The following subscriber and historical information about the customers or subscribers associated with Target Cell Phone #1 for the time period September 1, 2020, to the present:

    i.     Names (including subscriber names, user names, and screen names);

    ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.     Local and long distance telephone connection records;

    iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.     Length of service (including start date) and types of service utilized;

    vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.     Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Cell Phone #1 for the time period September 1, 2020, to the present including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from Target Cell Phone #1 for a period of **30** days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which Target Cell Phone #1 will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

c. Information about the location of Target Cell Phone #1 for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone #1 on the Provider's network or with such other reference points as

2

may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 involving Phillip Daniels.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon Wireless, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon Wireless. The attached records consist of _____.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon Wireless and they were made by Verizon Wireless as a regular practice; and

b. Such records were generated by Verizon Wireless's electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon Wireless in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by Verizon Wireless and at all times pertinent to the records certified here the process and system functioned properly and normally.

2

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature